My name is James Sessions and I am an attorney for Petitioner. There have been two recent developments that I think the court needs to know about. First of all, Petitioner's husband passed away on October 14, 2015. Hold it, I'm sorry. I'm sorry? I didn't hear what you said. Petitioner's husband, former husband, passed away on October 14, 2015. And second, Petitioner remarried a United States citizen on January 20, 2018. Passed away at 10, 14, and she remarried when? January 20, 2018. I thought you said he passed away in 2015. Yes, that's when he did. Sorry, I have a bad cold. When was this case filed? 2013. 2013. You couldn't send a letter between 2013 and 2018 to let us know about the developments and how it might impact this case? I'm sorry, but I didn't find out myself until last year. Well, last year still would have given us a little more notice. Now it's this year. Well, how do those facts affect your case in your mind? Well, the basic thrust of our argument is that our client was denied a fundamental right to a fair trial because the Petitioner's husband, for health reasons, was excused from the trial. And all the testimony that came before the immigration judge and the government only had one witness was by an examiner, I'm sorry, by an investigator. Did he submit a declaration or some sort of a letter? Yes, he did. There was a letter from a doctor indicating that for reasons of poor health, he could not testify. Well, is it your contention that he wasn't in fact in bad health and could have testified or is it that something else should have been done and if so, what? Well, we think he could have testified and something else might have been able to have done, perhaps his deposition taken in interrogatories. But the fact that he didn't on the investigator's testimony, all of which is hearsay, we subject. Counsel, what is the standard for failure to present? Over here, counsel. Counsel? Counsel, over here. Oh, I'm sorry. What is the standard for failure to present a witness? What must the government do in order to justify substitute testimony? We think the investigator's testimony should be stricken in its entirety. But what's the standard that we use to review whether or not the substitute testimony was permissibly considered? What do we look at? Whether or not it's fundamentally fair. Well, don't we look at whether or not the government made a reasonable effort to produce the witness? That's part of the standard. And did the government make a reasonable effort to produce the witness? I don't think so. Okay, what did the government do? We didn't know until the day of the hearing that he was not going to appear. No, but what did the government fail to do? It failed to, it accepted his statement that he was sick and could not testify because of all the stress. Well, it wasn't just his statement. There was a doctor's note of some detail. He did seem to have an awful lot of medical problems. That's true, he did. He was also, what, 84 or something? Say that again, ma'am. He was in his 80s at the time. He was 84, I think, of applying. This is the other question. How much did the IJ actually rely on him? Mostly, he went through all of her testimony and didn't believe a lot of it. And the letter, the jointly submitted original letter. And he did say he believed the agent, but he didn't rely too much, except in passing, on what the husband said, did he? I think the judge relied very heavily on the agent. Like where, for example? In the, for example, the investigator at one point claimed that, repeated, claimed that his testimony was what the husband told him. And that's at the administrative record in 254. Okay, but... So his testimony was critical to the government's case. Okay, but in the analysis, the IJ's analysis, where does he rely on it? I'm sorry, say that again, ma'am. In the IJ's analysis, how much and where does he rely on the husband, as opposed to going through the testimony of your client and debunking it, saying he didn't believe it for this reason and that reason? The judge placed considerable... I know, where? I want to know where. In the administrative record? Yes. Where did the IJ do that? I don't have that decision in front of me. I left it on the desk around... Okay. She did say that she found... I see there's a paragraph on page 27, he says, that Mr. Bassing asserts that he has been victim of fraud, he's also not getting assistance despite his old age. And that's sort of about it, in terms of what he says about the husband. The judge also found that the investigator had a lot of demeanor and she appreciated his testimony. Yes, she did say that. And she basically dismissed all of the testimony of the petitioner's witnesses, including the minister and other people who knew the couple. So I think... I see I'm running out of time. You actually have two and a half minutes. Do you want to save them for rebuttal? I think I would, Judge. Thank you. Okay, thank you. Good morning, Your Honors. May it please the Court. Andrew Nzinga on behalf of the Attorney General. Petitioner was an educated, sophisticated woman who married an ill and elderly man, and she knew that. I can't hear very well. Excuse me. Thank you. Petitioner... Much better. Thank you.  Despite that knowledge, the marriage fell apart almost immediately. The immigration judge simply had little objective evidence in front of her, and a reasonable fact finder is not compelled... She had a great deal of evidence. She had the woman's evidence. She had her mother's evidence. She had the pastor's evidence. She had the friend's evidence. More than... I mean, an unusual amount of evidence, actually. But amount of evidence doesn't equal useful evidence. For example... You started out by saying she had very little evidence. She didn't have very little evidence. Minimal objective evidence of a woman... Well, the observations of relatively non-involved people like the pastor are not objective. Well, I think, in fact, the pastor is a great example, Your Honor. When specifically pressed on AR-474, he kept saying, well, yeah, Mr. Busso loved Petitioner. The immigration judge said, okay, look, I understand that. What about the wife? What is her intention if you have an opinion? His answer, I don't, Your Honor. There's a problem. There seems to be a bias implicit and, if not explicit, in both the IJ and the BIA opinions that despite the level of poverty in which the Petitioner found herself with her new spouse, that there was an expectation that she would forego work and stay home and take care of him because he was sick. I think the BIA says that explicitly, and the IJ seems to talk about it, too. Like, why did she go out and work? Why did she have to work? She should have stayed home and taken care of this sick man. No, no, it has a lot to do with it because this is whether or not she made her burden of proof as to whether the marriage was in good faith or whether it was a sham. And they seem to be equating good faith with the Petitioner staying home and taking care of the spouse because he was elderly and sick. They're not requiring in any way that a wife do such a thing, but when the expectation of the marriage was this situation, that— What really appears to have happened was he wanted to marry somebody who would be a nursemaid. That's what it amounted to. Well, Your Honor, as the Supreme Court said— And the reason he said she was defrauded was because she wasn't acting as a nursemaid. There's no set formula for whether marriage is bona fide or not. Is this a marriage maybe people—well, most people would want? No. But people are allowed to make their own decisions about what they want. Yeah, it's Thursday, December marriages. That happens quite a bit. And who knows what all the motivations are, but does that necessarily mean it's a sham marriage? The issue is not whether or not—the immigration judge explicitly said it had nothing to do whether or not there was an age difference or what the expectations were. Well, it did—it certainly had to do—I mean, at least a lot of his— the IJ's debunking of her testimony was based on what the expectations were. The fact that she wasn't staying home and taking care of him, but was going out to work. Well, the immigration judge, she had—well, she had minimal evidence to suggest otherwise, but the— What's the other one? Otherwise as to what? Well, first of all, the difficulty is why she went to work almost immediately when— She didn't have any money. Well, and again, that's where she's more confident. The difficulty is this is a morass of facts you're on. Now, we can sit here and make a lot of inferences, except the immigration judge, she's the fact finder. Right, but she has to take—she has to make decisions within the law, within their legally cognizable. I guess the—okay, so let's go back to what efforts did the government make to have the spouse attend the hearing? Or what efforts did they make to actually get information from the spouse? Well, they went—obviously, initially, the husband contacted the senator who then referred the case to ICE. When ICE got the case, they went and talked to the husband, and they issued the notice to appear. But wasn't the appropriate thing to be done at that point since they're saying opposite things, and he's not available to just not use him at all? Just don't use him. I mean, they could do her credibility all by herself, but just not use him. Yeah, I think that's—certainly, there was no real need for his testimony. Petitioner essentially tries to sort of shift the evidentiary burden on her in order to sort of just blame the government. Why didn't the government do this? Why did the EIJ rely on the agent? Except the EIJ didn't rely on the agent. Well, he certainly heard about quite a lot, and he did in that paragraph I read, relying on the husband to some degree. So it seems the whole thing would have certainly worked a lot better if he just didn't use him because you had a situation where you had a direct contradiction, and she was going to be greatly impeded in her ability. Because she was there, they got to do all this cross-examination of her, and then it was concluded that she was not credible because she said contradictory things or whatever. If he'd been there, the same thing might have happened to him, but he wasn't there. So it wasn't a fair—in that sense, it doesn't seem fair. Well, except, again, she has the burden of proof, and the immigration judge did not say, well, the husband said this, case over. What the immigration judge did, she went through this, again, just this morass of facts and tried to understand, well, what is going on here? Where is the evidence to really compel reversal? There are no joint assets, and yes, they didn't have a lot of money, but the difficulty is when you don't have joint assets, and the money issues get complicated because of the money that he gave her that we don't know what happened. But ultimately, the immigration judge didn't say. The husband said— So what are the typical things you look at? They lived together? She moved into the apartment? The typical cases tend to be joint assets, cohabitation, actions before and after the marriage. Did they live together? How long were they actually living together? That was the part that troubled me. It wasn't clear from the record that she actually lived with her spouse. Well, I think that's a lot of the difficulty, Your Honor, is things aren't really clear. It's nice to be able to stand up here as a lawyer and say, here's the narrative that the government has or here's the narrative that Petitioner has. I can't do that. But what does the record reflect regarding how long she actually lived with her spouse? Well, it goes from about three days to three weeks, depending on who you believe, and then the pastor said months. But she also says, and there doesn't seem to be any disagreement about this. I don't remember whether he disagreed, that for another year and a half she came there every day and cooked and cleaned and took care of him and had her stuff there and so on, and it wasn't until after the divorce that he threw all her stuff out of the house and so on. Well, the question is, does that mean living together? Is that cohabitation when this unusual situation occurs? Well, it means some sort of devotion. I mean, there's no suggestion she was getting paid for that. Well, again, there's no requirement that she get paid. I understand, but if she were paid, you might think she was doing it because she was paid, but she says she was doing it out of devotion that he threw her out of the house. And actually in one of his letters he does say he threw her out of the house. Oh, absolutely. Absolutely. He did. That doesn't mean it was a sham to begin with. But it doesn't mean it was bona fide. Well, if he threw her out of the house in three weeks, then the fact that she isn't living there anymore is because he said she came home too late, which is also what she says. And instead she was living right downstairs and coming upstairs in the morning and cooking and so on. Why does that just prove that they had, again, a somewhat unusual marriage, given the fact that I gather it was a one-room apartment and that she was waking him up at night? Right, except the difficulty is that she knew the situation that she was married into. And, yes, she woke him up and she began working immediately after arriving in the United States on her green card. Despite knowing what the situation was, despite him already giving her $10,000, she just started working immediately. And, again, just to briefly answer the question, the mom and petitioner aren't even consistent about whether or not he wanted her to work or not. Let me ask you something. Suppose we find there was a due process violation. Can it ever be cured now that he's dead? I don't know. Do you agree that he's dead? I mean, do you accept that? I mean, we don't have a piece of paper. Well, I think the difficulty is when someone walks into court the day of argument when this case has been sitting here for five years. Right. Five years. I really can't answer. I just don't know, Your Honor. I'm sorry. What about the fact that she's now remarried? Is that marriage not going to work unless this one's cleared up? That is a good question, Your Honor. The difficulty is when you marry during removal proceedings, and, of course, it depends whether or not she's still technically in proceedings or not, depending on the case law, which gets complicated on that matter. If she marries during removal proceedings, the marriage is presumptively fraudulent. But also I thought it was also true that if her earlier marriage was fraudulent that she couldn't enter into a valid marriage now. Well, the difficulty is the immigration judge didn't affirm specifically that she'd entered into a marriage fraud. She was removable because she failed to waive the requirements for a joint petition for review. I see. I see. She does have removal order, and she would need reopening, waivers. It gets very complicated. Could we remand and let the agency figure this out, given the death and the new marriage? I don't know how it all weighs. You can't tell us how it weighs. I'm sure the POSI counsel can't tell us how it all weighs. I know. Except the Supreme Court's recognized that delays such as five years. This case went to immigration judges. I mean, whose fault is the delay? It doesn't seem like it's anybody's fault. It seems like it's been in our court for five years. Well, I'm not going to say that. Has anyone asked for an explanation? No comment, Your Honor. I know. It's been eight years, and the Supreme Court says delay works. I know, but did anyone, did the government or the petitioner, ask for an extension of time while it's been on appeal? No, Your Honor. Of course, no one. The difficulty is when someone walks into court the day of an argument and attempts to present facts outside the record. So in terms of remand, no. Counsel, may I ask you this? If there were a due process violation by allowing the statement of a spouse to be considered, was there prejudice? Your Honor, thank you. That's what I had hoped to get to before I ran out of time. No. Well, it seems to me there definitely was, because even though there's not that much of it, but I'm reading now, and here his ultimate conclusion was, there were sponsors that did not intend to make a life together with Mr. Besser for any period of time, and certainly not to fulfill his expectation that he would have a younger wife that could take care of him while he was elderly and in poor health. So that second part is, A, based directly on him, and B, very questionable. A, it's based on the joint letter they filed. She signed. She signed. It's not hearsay. The difficulty, a lot of things are claimed to be hearsay. The letter said that he wanted her to come and take care of him? The understanding in that letter filed with the CIS in order to adjudicate her very initial green card application, was he understood the situation? Your Honor, it's distasteful. Okay, let's not go there. Well, but this is where we are going. No, no, no. You're over your time. Thank you. Distasteful isn't a proper argument. Thank you. And counsel, you have two minutes and a half. To be clear, I wasn't suggesting your Honor was distasteful. Well, I'm saying, I don't think distasteful, distasteful presumes a moral judgment, and we're not doing morality here. We're doing the law. Right, Your Honor. Except Judge Berzon was concerned that this was somehow inappropriate, and I'm just simply suggesting that we made a disagreement. I definitely think you should remove moral judgments from your legal arguments. Thank you, counsel. You may sit down. Thank you. And opposing counsel, you have two and a half minutes. Thank you, Your Honor. On the question of how long the parties maintained contact, they were married on December 22nd, 2003, divorced on June 6th, 2008. That's four and a half years. But, counsel, my question was how long did they actually live together as husband and wife? They maintained this arrangement whereby she would, after several months, she would sleep with the mothers in the mother's apartment. In the morning she would get up, cook breakfast, and meet with her husband in his apartment. And this went on until June 25th. That was the day when the ñ Was that by mutual agreement? That was by the husband's direction. And where in the record can we confirm that the husband directed her to live with her mother rather than with him? It's in my client's testimony, and I think it also, I believe, the testimony of the pastor and one of the church witnesses who were aware, generally, of what was going on. And it was also in one of his declarations. I think that's right, too. But where in the record did he say that he agreed, specifically where he said he agreed that his wife could live with her mother rather than with him? I just don't recall that from the record, that he agreed with that. It was an agreement. It was an order. That's what she was ordered to ñ She was ordered to live separately from him? Yes. That's in his ñ that's in his statement? That's in my client's testimony. It also was. I won't have to find it, but I thought it was in a letter, one of his declarations where he said that he told her that she should stay at the mother's because it was keeping her up at night, him up at night. But I'd have to find that. Counsel, could you answer the question? Over here. Could you answer the question that Judge Wardlaw asked about what would be the effect of the remarriage on her eligibility to adjust status? I think that she would be treated as being married during proceedings and would have to meet the clear and convincing standard that the marriage is bona fide. What I would suggest to the court, and one of the things I pointed out in my brief, was that this case started with a letter from Senator Inouye, an icon in the United States in here, and ICE took that and they proceeded to meet Mr. Boswick for over two years. They met with him. They drafted documents for him, but they never bothered to look at any of the witnesses. They didn't do a thorough investigation. They didn't really talk to my client. They really didn't talk to any of the witnesses, and the investigator conceded that it's normal practice to talk with the defendant. There was no Q&A of the defendant. I think this case should go all the way back to the field office in Honolulu only for a thorough analysis and investigation in connection perhaps with a I-130 petition that my petitioner's new husband will be filing. Have you moved to reopen? No. Okay. Well, thank you, Counselor. Well, thank you. This case will be submitted. Basic v. Sessions, and we'll take up Roberts v. City and County of Honolulu.
judges: Wardlaw, Berzon, Rawlinson